UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ALONZO DEAN JENKINS,

Defendant.

Case No. 3:17-cr-00108

**MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

COMES NOW ALONZO DEAN JENKINS, by and through counsel and hereby respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for a reduction in sentence. As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Such reasons are present here.

Mr. Jenkins can establish extraordinary and compelling grounds for a reduction in sentence due to the unacceptably high risk of death or permanent damage to his health that he faces by the COVID-19 pandemic. The highly contagious disease has so far infiltrated most federal prisons – including Canaan USP, the facility where Mr. Jenkins is housed, which currently has reported 358 positive tests.[1]

Mr. Jenkins has a medical diagnosis of high blood pressure or hypertension, for which he receives medications, that may place him at increased risk if he is exposed to the

---

[1]     BOP: COVID-19 Update https://www.bop.gov.coronavirus/index.jsp (last visited March 31, 2021).

1

coronavirus.[2] According to the CDC,[3] based on his medical condition(s), conditions including "possibly high blood pressure (hypertension) **can make you more likely** to get severely ill from COVID." (emphasis in original).[4] Mr. Jenkins has a release plan in place where he proposes living with his elderly grandparents who are in need of physical assistance, finding employment, and participating in treatment.

Granting this motion is entirely consistent with U.S.S.G. § 1B1.13, the Guidelines policy statement for compassionate release motions. In particular, Mr. Jenkins can satisfy the Application Note categories of "extraordinary and compelling circumstances," based on his medical condition,[5] as well as the catchall "other reasons" category.[6]

---

[2]    Mr. Jenkins' diagnosis is listed in his PSR.   [Dkt. 91 at 20]   Additional documentation of this diagnosis or medications will be provided to the court as soon as it is received.

[3] *See* Centers for Disease Control and Prevention, *People Who Are at Increased Risk for Severe Illness*, (June 25, 2020), available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; High blood pressure (hypertension) is listed as a condition that might put individuals at an increased risk. *People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited April 1, 2021).

[4]    *See id* (Certain Medical Conditions and Risk for Severe COVID-19 Illness | CDC)/

[5]  U.S.S.G.  §  1B1.13 cmt. n.1(A)(ii) (defining "extraordinary and compelling circumstances" where defendant suffers from medical condition that substantially diminishes defendant's ability to provide self-care within a correctional environment).

[6] *Id.* cmt. n.1(D) (as determined by the BOP director there exists "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)).

2

Mr. Jenkins' continued confinement at USP Canaan, in the midst of the COVID-19 pandemic (which has now infiltrated Mr. Jenkins' facility,) poses a serious and particularized threat to his health and life. Mr. Jenkins asks that the Court reduce the originally imposed 100-month sentence by 50 months, to time served.[7]

Undersigned counsel sent a letter to the warden of USP Canaan on February 9, 2021 on behalf of Mr. Jenkins.[8] Thirty days has passed from that time, therefore as explained below, this Court is empowered to adjudicate the merits of his application for compassionate release. The warden of the facility has not yet provided a response to client's application. Mr. Jenkins asks that the Court find that he has exhausted administrative remedies.

As to the scope of relief, Mr. Jenkins' proposed release plan, as set forth below, is a solid plan that should assure this Court that he would not pose a danger to the community if released. As an alternative, however, Mr. Jenkins does not object to this Court modifying his term of supervised release to include home detention with or without electronic monitoring for the period of time equal to the remaining term of incarceration he would serve without this Court's modification order if the court wants extra assurances. Such a modification will effectively allow him to finish the remaining portion of his prison sentence on home confinement, which will in turn allow him to protect himself and others

---

[7]   Mr. Jenkins was arrested on November 17, 2017 and his current release date per BOP's website is February 10, 2025, therefore with credit for good time he is close to serving half of his sentence.

[8]   *See* Attachment A (letter to Warden)

3

from the spread of COVID-19 by sheltering in place at his grandparents' residence and helping them.

Mr. Jenkins' grandparents raised him [See PSR, Dkt. 91 at 18] but are now in their 80's and would greatly benefit from Mr. Jenkins' assistance with physical tasks that are difficult for them to perform without assistance. Mr. Jenkins has demonstrated his ability and willingness to help elderly people by performing physical tasks that are much easier for a young man to perform. [See Dkt. 83-1 at 4] Mr. Jenkins has a close relationship with his grandparents and lived with them when he was growing up, prior to getting into criminal trouble. [Dkt. 91 at 18] Both grandparents would welcome Mr. Jenkins back into their home. Mr. Jenkins' grandfather is a pastor and who has depended on Alonzo "in helping the elderly and others." [Dkt 83-1 at 4] Mr. Jenkins' grandmother continues to maintain contact with her grandson. Both grandparents communicated with counsel that they are supportive of his release to their home in Atlanta, Georgia where they could benefit from his assistance.

## I.     PROCEDURAL HISTORY OF THE CASE

On November 20, 2018, this court sentenced Mr. Jenkins to 100 months' incarceration with 3 years' supervised release for Felon in Possession of a Firearm in violation of 18 USC secs. 922(g)(1) and 924 (a)(2). [Dkt. 94] The court strongly recommended that Mr. Jenkins be paced at FCI Jesup or USP Atlanta to allow for family visitation, and that Mr. Jenkins be evaluated for participation in the Residential Drug Abuse Program. [Dkt. 94] This class C felony carries a maximum penalty of 10 years

4

imprisonment[9] and a Guidelines range of 100-120 months. [See Dkt. 77; Dkt. 91 at 1 ]

Mr. Jenkins was arrested on November 17, 2017. [See docket report, no docket number provided] It appears from the docket report that Mr. Jenkins has been in custody in connection with the present offenses since his arrest. According to the Bureau of Prisons, his current release date is February 10, 2025, leaving about 46 months to serve of the original 100-month sentence.

In the past, as a young man, Mr. Jenkins had some disciplinary cases while incarcerated. [Dkt. 91 at 2] The last such incident discussed in the PSR occurred in 2018. [*Id*.] Since that time Mr. Jenkins has made good use of his time (to the extent that he has been able to with COVID-19 restrictions in place). He participated and completed multiple classes that were offered to him and had been working in the kitchen at USP Canaan. There is a sole recent report that deserves discussion: a prohibited cell phone was found in a room in USP Canaan and the inmates who had access to the area, including Mr. Jenkins, were disciplined for the unauthorized phone. There was nothing tying the phone specifically to Mr. Jenkins, but he was disciplined because he was one of the inmates who had access to the area where the phone was discovered.

## II.  ARGUMENT

### A.  The court has the authority to consider Mr. Jenkins' motion because more than 30 days have elapsed since the request was received by the warden.

---

[9]      18 USC 922(g)(1), 18 USC 924 (a)(2).

5

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

In this case, the timing provision has been satisfied. Mr. Jenkins submitted a request for reduction in sentence to the warden of his facility on February 9, 2021, more than 30 days ago, providing the basis for the Court to consider this motion. *See, e.g., United States v. Joling*, 2020 WL 1903280, at *2 (D. Oregon April 17, 2020) (quoting *Brown v. United States*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019) ("Exhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it.")); *United States v. Robinson*, 2019 WL 2567356, at *2 (W.D. Wash. June 21, 2019) (staying consideration of a compassionate release motion for exactly the 30-day period). This motion is ripe for review on the merits.]

**B.    This Court is empowered to determine what constitutes "extraordinary and compelling" reasons that justify a reduction in sentence.**

Title 18, United States Code § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a

6

reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction. Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term.

The policy statement authorizes a reduction in sentence when there are "extraordinary and compelling reasons" that warrant the reduction; or the **"**defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison" for the offense or offenses for which the defendant is imprisoned, provided that the defendant is not a danger to the safety of any other person or to the community, and the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A)-(B).

The application notes also provide three examples of "extraordinary and compelling circumstances," which includes (1) a defendant who is suffering from a terminal illness, defined as "a serious and advanced illness with an end of life trajectory"; (2) a defendant who is suffering from a serious physical or medical condition or cognitive impairment, or mental health impairment because of the aging process that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; and (3) the defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less. U.S.S.G. § 1B1.13(1)(A)-(B) (emphasis

7

added). A fourth category applies when the defendant is the only available caregiver for their minor child or relative. U.S.S.G. § 1B1.13(1)(C).

The Guidelines policy statement also includes a fifth "catchall" provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as *determined by the Director of the Bureau of Prisons*. U.S.S.G. § 1B1.13, comment. n. 1(D) emphasis added).

    *1.  This Court's discretion is not limited by the existing policy statement.*

Although Section 3582(c) directs the Court to grant a reduction in sentence where doing so is consistent with any "applicable" policy statement, U.S.S.G. § 1B1.13 was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP.

Because the Commission has not updated its policy statement to account for the changes imposed by the First Step Act, the overwhelming majority of district courts around the country have ruled that, in the absence of applicable policy statements, courts "can determine whether any extraordinary and compelling reasons other than those delineated in [U.S.S.G. § 1B1.13] warrant" sentence modification. *See, e.g., United States v. Rodriguez*, 2020 WL 1627331, at *4 (E.D. Pa. Apr. 1, 2020); *United States v. Brown*, -- F.Supp.3d --, 2019 WL 4942051, at *2 (S.D. Iowa Oct. 8, 2019).

These courts have held that the First Step Act's amendments demonstrate that the existing policy statement no longer "complie[s] with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification

8

provisions under Section 3582." *United States v. Cantu*, -- F. Supp. 3d --, 2019 WL 2498923, at \*4 (S.D. Tex. June 17, 2019) (publication forthcoming).

Further, because Congress enabled incarcerated persons to file "direct motions to district courts" for sentence modification in part to "increase the use of compassionate release," the "only way" to give force to that command "is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" *Brown*, 411 F. Supp. 3d at 451; *United States v. Redd*, 2020 WL 1248493 at \*7 (E.D. Va. March 16, 2020) (citing cases).

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) which implicitly recognizes that other "compelling reasons" could exist aside from what is listed. *See United States v. Urkevich*, 2019 WL 6037391, at \*3 (D. Neb. Nov. 14, 2019) (noting that § 1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, ––– F. Supp. 3d ––––, 2019 WL 2716505, at \*8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach ... [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

Consequently, the phrase "as determined by the Director of the Bureau of Prisons" has no effect on the court's discretion when determining what constitutes "extraordinary and compelling" circumstances. *United States v. Redd*, 2020 WL 1248493, at \*7 (E.D. Va. March 16, 2020) (citing cases). *See also United States v. Perez*, 2020 WL 1180719, at \*2

(D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)); *United States v. Maumau*, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020); *United States v. Fox*, 2019 WL 3046086 at *3 (D. Me. July 11, 2019); *United States v. Rivernider*, 2019 WL 3816671 at *2 (D. Conn. Aug. 14, 2019); *United States v. Bucci*, 2019 WL 5075964 at *1 (D. Mass. Sept. 16, 2019); *United States v. Dusenbery*, 2019 WL 6111418 at *3 n.3 (N.D. Ohio Nov. 18, 2019); *United States v. Schmitt*, 2020 WL 96904 at *3 (N.D. Iowa Jan. 8, 2020).

To the extent that Section 1B1.13 has any application, the Court should view itself as standing in the position of the Bureau of Prisons. And now that the Court stands in the shoes of the Bureau of Prisons, it is up to the Court to decide what circumstances qualify. *See Brown,* 411 F. Supp. 3d at 449. The Government has conceded this point in other cases.[10]

Some cases from the District of Alaska have agreed with this reasoning. *See United States v. Valdez*, Case No. 3:98-cr-0133–01-HRH, Doc. 647 at 5 (D. Ak. Nov. 6, 2019) (holding that a district court is no longer bound to look to the director of the Bureau of

---

[10] In *United States v. Young*, the Government conceded that although the policy statement provided "useful guidance," the statement was not binding on the court. 2020 WL 1047815, at *2 (M.D. Tenn. Mar. 4, 2020). The court went on to hold that federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons.

Prisons for a catch-all definition of extraordinary and compelling reasons justifying a reduction in sentence); *United States v. Fields*, Case No. 3:12-cr-00022-JKS-DMS, Doc. 223 at 9 (D. Ak. May 6, 2020) ("This Court is persuaded by the reasoning of those district courts that it is not constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction and that it may consider any reason it finds extraordinary and compelling.").

Here, this Court has discretion to assess whether Mr. Jenkins presents "extraordinary and compelling reasons" for his release, regardless whether they fall within or outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement.

2. *A reduction in sentence for non-medical and non-age-related reasons is consistent with the BOP program criteria.*

At least one court has found that the existing BOP program statement does in fact permit a reduction in sentence for reasons other than the specific examples identified in U.S.S.G. § 1B1.13(1)(A)-(C). In a recent 80-page opinion, Judge Kearney in the Eastern District of Pennsylvania found that an inmate who did not otherwise satisfy the specific compassionate release criteria described under subsections (A)-(C) was entitled to compassionate release under the catchall category, and *that doing so was entirely consistent with the existing Bureau of Prisons' compassionate release criteria*, Program Statement 5050.50. *United States v. Adeyemi*, Case No. 06-124, Doc. 198 (E.D. Penn. July 6, 2020). The BOP factors include the nature of the defendant's offense, the defendant's personal

11

and criminal history, and whether release would minimize the severity of the offense.[11]

Mr. Adeyemi was sentenced to serve a brutally long sentence which consisted of multiple "stacked" mandatory minimum sentences for violations of 18 U.S.C. § 924(c) predicated on armed robbery offenses. Mr. Adeyemi, who suffered from asthma, was also at greater risk for complications if he was infected with COVID-19. Judge Kearney found that, although neither circumstance fit squarely within the specific examples under U.S.S.G. § 1B1.13, cmt. n.1(A)-(C), compassionate release was consistent with Application Note 1(D). Mr. Adeyemi's circumstances, including the concerns raised by his health condition amidst a COVID-19 outbreak in his prison and his lengthy sentence, fulfilled the factors outlined under the Director's Program Statement 5050.50 for "other" extraordinary and compelling reasons. *Adeyemi*, at 44-50.

In the instant case, in addition to the medical concerns, Mr. Jenkins has an opportunity to reside in a safe residence where he will be of great assistance to his elderly grandparents, participate in treatment and continue to be supervised under his conditions of supervised release (and additional safeguards, such as electronic monitoring, if the court so requires). U.S.S.G. § 1B1.13(1)(C) recognizes that when the defendant is the only available caregiver for their minor child or relative, this factor may be considered. Here, a similar situation has arisen. Mr. Jenkins is willing and able to provide physical assistance to his elderly grandparents and is, to counsel's understanding, is the only relative available

---

[11] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.50.

to provide such assistance. Under the combination of circumstances in this case, Mr. Jenkins asks this court to grant compassionate release.

### 3. Mr. Jenkins can establish "extraordinary and compelling" reasons based on his medical vulnerability to COVID-19.

Even if this Court finds that it is constrained by the existing Guidelines policy statement, Mr. Jenkins qualifies as an inmate suffering from a medical condition that makes him more vulnerable to COVID-19. The comment to USSG 1B1.12 addresses conditions that "*substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.*" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). Mr. Jenkins' has increased risk of serious health consequences if he is infected with COVID-19 and remains in a facility where he cannot socially distance and faces repeated exposure – in other words he cannot sufficiently provide self-care in a correctional environment and there is a risk that if he is infected he may not recover.

A number of courts have concluded that releasing inmates who are especially vulnerable to coronavirus is consistent with Comment Note 1(A)(ii)(I).[12] For example, in

---

[12] Those orders that weigh COVID-19 vulnerability in the compassionate-release calculus include *Miller v. United States*, 2020 WL 1814084, at *1,4 (E.D. Mich. Apr. 9, 2020); *United States v. Colvin*, 2020 WL 1613943, at *3-4 (D. Conn. Apr. 2, 2020); *United States v. Resnick*, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020); *United States v. Gonzalez*, 2020 WL 1536155, at *2-3 (E.D. Wash. Mar. 31, 2020); *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020); *United States v. Campagna*, 2020 WL 1489829, at *1, 2 (S.D.N.Y. Mar. 27, 2020).

13

*United States v. Zukerman*, the district court found that Mr. Zukerman's age, combined with his medical conditions which included diabetes and hypertension, qualified as chronic conditions that in the context of the COVID-19 pandemic substantially diminished the defendant's ability to provide self-care in a correctional environment. 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020).

In compassionate release proceedings across the country – including this district – the Department of Justice has taken the position that inmates suffering from medical conditions placing them at greater risk of injury or death due to COVID-19 exposure have established "extraordinary and compelling" grounds for release under 18 U.S.C. § 3582(c). *See United States v. Wholecheese*, Case No. 4:16-cr-8-RRB, Doc. 61 at 6 (Gov. Opp. Br.) ("The government concedes that the CDC considers diabetics a high-risk group for COVID-19 . . . and that extraordinary circumstances therefore currently exist." (citing U.S.S.G. §1B13.1, application note (1)(A)(ii)(I).")).

In a supplemental filing made in *United States v. Wise*, the Government acknowledged that under DOJ's own guidance, the defendant's diabetes diagnosis constituted "extraordinary and compelling circumstances," during the current pandemic, which justified compassionate release. *United States v. Wise*, 1:18-cr-00072-ELH, Doc. 185 (D. Md. May 18, 2020). The Government has made similar concessions in dozens of other cases.[13]

---

[13] *See, e.g.,* Government's Supplemental Response, *United States v. Firebaugh*, 1:16-cr-20341-UU, ECF 43 (SD. Fl. Jun. 1 2020) (defendant's COPD and Type II diabetes present

14

Based on his medical vulnerabilities to COVID-19, Mr. Jenkins cannot exercise self-care in a correctional setting in the midst of the pandemic. He therefore satisfies the U.S.S.G. policy statement found at U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

### C. The conditions of confinement at federal facilities prevent effective control of COVID-19.

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[14] COVID-19 is a serious disease that makes certain populations of people severely ill and can lead to death. About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu.[15]  It estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id.*[16]  On March 26, 2020,

---

"'serious physical or medical condition(s) ... that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he  . . . is not expected to recover.'"); Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51 (S.D. Fla. May, 26, 2020) (conceding that if defendant presents one of the CDC risk factors as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release even if that condition in ordinary times would not allow compassionate release); Government's Response, *United States v. Washington*, 4:04-cr-02090-DCB-HCE, ECF 484 (D. Az. May 22, 2020) (same); Government's Response, *United States v. Hird*, 2:13-cr-0039-TJS, ECF 650 (E.D. Pa. May 19, 2020) (same).

[14] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[15] Pien Huang, How The Novel Coronavirus And The Flu Are Alike ... And Different, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

[16] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

15

the United States became the global leader in COVID infections.[17]

As the Court is surely aware, incarcerated individuals are at greater risks to exposure and transmission of COVID-19,[18] and the consensus of public health experts is that decarceration is necessary to slow COVID-19's transmission.[19]

It is widely agreed that conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[20] It is also well established that COVID-19 case rates have been substantially higher and are escalating much more rapidly in prisons than in the U.S. population as a whole. According to a recent study published in the Journal of the American Medical Association (JAMA), **the known infection rate for COVID-19 in jails and prisons is about 5.5 times higher than the general population, and the fatality rate is approximately 3 times higher**.[21]

These findings should come as no surprise. Because inmates eat, sleep, bathe and recreate together in close quarters, controlling the spread of infection in these environments

---

[17] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, BUSINESS INSIDER (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

[18] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2QNWn1d

[19] *See generally,* the April 1, 2020 letter from the Federal and Community Defenders to the Attorney General, Exhibit D-5.

[20] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910.

[21] Brendan Saloner, Kalind Parish, Julie A. Ward, et. al, *COVID-19 Cases and Deaths in Federal and State Prisons*, JOURNAL OF AMERICAN MEDICAL ASSOCIATION (July 8, 2020), available at https://jamanetwork.com/journals/jama/article-abstract/2768249

is extraordinarily difficult.[22] Once the virus enters a facility, the results are devastating. Five of the biggest COVID-19 clusters in America have occurred within the walls of correctional facilities.[23] Federal facilities have seen some of the largest COVID-19 outbreaks in the United States; over 52,371 people in its facilities have tested positive for the virus, and 228 federal inmates have died.[24] On July 26, widespread testing revealed 949 positive cases – nearly the entire inmate population – at the Seagoville Federal Correctional Institution in Dallas County, Texas, putting the facility at the top of the list for active COVID-19 cases.[25]

And even these numbers are certainly an undercount, because there is almost no testing being conducted at the most seriously affected sites. In at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[26]

---

[22] Attachment D-1 (declaration of Chris Beyrer, M.D.).

[23] Timothy Williams, Libby Seline and Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* NEW YORK TIMES, (June 16, 2020) ("By now, the five largest known clusters of the virus in the United States are not at nursing homes or meatpacking plants, but inside correction institutions, according to data The New York Times has been collecting about confirmed coronavirus cases since the pandemic reached American shores."), available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html

[24] https://www.bop.gov/coronavirus/index.jsp (last visited April 2, 2021).

[25] Kelly Davis, The Appeal, July 16, 2020, Coronavirus in Jails and Prisons (July 16, 2020) available at https://theappeal.org/coronavirus-in-jails-and-prisons-33/

[26] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission*,' The Lens (Mar. 31, 2020) (available at: https://bit.ly/34Az7tf) ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

17

As a practical matter, BOP is unable to accurately identify who has coronavirus and who does not. The agency can do little more than screen for symptomatic coronavirus carriers, mask and isolate any they find, and bar unnecessary visitors—which is precisely what they are doing.[27] Yet the screening involves no actual testing; rather, BOP asks inmates two questions: has the inmate traveled anywhere risky in the last two weeks, or has the inmate been in "close contact" with a diagnosed coronavirus patient:[28] The staff screening tool is little better—it just checks for fever, cough, or a runny nose:[29]

This is a problem. Symptoms don't even appear for "2–14 days after exposure," according to the CDC,[30] and some estimates suggest as many as 60% of carriers may be entirely asymptomatic.[31] Other carriers are pre-symptomatic: researchers have found the median incubation period is 5.1 days[32]—meaning recently-infected inmates will pass

---

[27] *See* Bur. of Prisons, *BOP Implementing Modified Operations* (available at: https://bit.ly/2XzmsFt).

[28] *See* Bur. of Prisons, "Covid-19 Screening Tool,*"* available at: https://bit.ly/2Xxemx7.

[29] Bur. of Prisons, "Coronavirus Disease 2019 (COVID-19) Staff Screening Tool,*"* available at https://bit.ly/3a5f7Al.

[30] Cntrs. for Disease Control, "Coronavirus Disease, Symptoms," (July 16, 2020) (available at: https://bit.ly/3bumnqt).

[31] Jane Qiu, "Covert coronavirus infections could be seeding new outbreaks," Nature (March 20, 2020) (available at: https://go.nature.com/3bxZeUd); see also Cntrs. for Disease Control, Healthcare Professionals: Frequently Asked Questions (March 22, 2020) (available at: https://bit.ly/2y6X6Eh) (noting "reports of asymptomatic infection with COVID-19"); see also Xingfei Pan et al., "Asymptomatic cases in a family cluster with SARS-CoV-2 infection," 20 Lancet 410–11 (Feb. 19, 2020) (in three-person family, two carried coronavirus but were asymptomatic) (available at: https://bit.ly/3ciw3oC).

[32] Stephen A. Lauer, Ph.D., *The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application*, Annals of Internal Med. (Mar. 10, 2020) (abstract) (available at: https://bit.ly/2XztWbU).

18

BOP's screening for almost a week before detection is even possible.[33] Pre-symptomatic and asymptomatic carriers are everywhere, and without widespread testing, BOP's screening cannot detect them.

Apart from the questionable numbers, BOP fails to consistently follow its own policies. Staff who should be quarantined after exposure aren't.[34] Prisons are failing to stock basic essentials like soap.[35] The situation is so poor that a union representing 30,000 BOP employees has filed an OSHA complaint because "staff who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[36]

In short, the virus continues to spread, and despite well-intentioned BOP officials, the agency is ill-equipped to confront one of the most infectious and deadly diseases of the last century.

**D.     Mr. Jenkins could face a high risk of serious illness or death if he contracts COVID-19.**

---

[33] *See generally* Pien Huang, *Can A Coronavirus Patient Who Isn't Showing Symptoms Infect Others?*, Nat'l Pub. Radio (Apr. 13, 2020) (available at: https://n.pr/2VoAirL).

[34] Joseph Neff & Keri Blakinger, *Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus*, The Marshall Project (Apr. 3, 2020) (available at: https://bit.ly/2VkWuTC).

[35] See Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020) (available at: https://on.wsj.com/3a4TD6K).

[36] See Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities* (Apr. 7, 2020) (available at: https://bit.ly/3a5r3C9).

19

Mr. Jenkins submits that his medical condition qualifies as a serious physical or medical conditions that, in the context of the COVID-19 pandemic, constitute "extraordinary and compelling" circumstances that warrant his release from custody.

The CDC and other medical authorities have clarified that COVID-19 is especially dangerous for people with severe chronic medical conditions.[37] As an incarcerated person, it is impossible for Mr. Jenkins to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease. Mr. Jenkins has reported to counsel that in USP Canaan all inmates do not use masks, common items (such as phones and computers) are not cleaned between users, and bunks are placed less than six feet apart.

For this reason, many district courts have found that inmates like Mr. Jenkins who suffer from CDC-recognized vulnerabilities are afflicted with a medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). *See e.g., Jackson*, 2020 WL 3396901, at *5 (N.D. Ind. June 19, 2020) (defendant suffering from hypertension and bronchitis); *United States v. Madrigal*, 2020 WL 3188268, at *2 (N.D. Cal. June 15, 2020) (defendant suffering from severe obesity and hypertension); *United States v. Purpera*, 2020 WL 3272049, at *2 (W.D. Va. June 17, 2020) (hypertension and kidney disease); *United States v. Perdigao*, 2020 WL 1672322, at *1 (E.D. La. Apr. 2, 2020) (hypertension and cardiac problems).

---

[37] *See* CDC, *Older Adults* (Mar. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html.

Mr. Jenkins is both (1) more likely to contract COVID-19 as long as he remains in BOP custody, and (2) more likely to develop severe complications from COVID-19 if exposed. This risk of serious illness or death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

E. **Mr. Jenkins will not be a danger to the community if released, and a sentence of time served constitutes a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Mr. Jenkins has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Jenkins for the serious sentence originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v.*

21

*Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

Additionally, Mr. Jenkins' attempts at participating in programs and working in the kitchen while serving about half of his sentence (subject to limitations on participation due to COVID-19), establishes that the purposes of punishment have been met. Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." 562 U.S. at 492. With the safeguards in his release plan (which include strong family support and could include electronic monitoring and/or house arrest with passes for treatment and work) has shown by willingness to participate in rehabilitation that he no longer threatens public safety, and that granting him compassionate release would not endanger the community.

In a recent report, the American Civil Liberties Union examined crime rates in 29 localities that reduced their jail populations as a public safety measure in the wake of the coronavirus pandemic.[38] The analysis showed that these communities did not see any increase in crime in the months after these jail reduction efforts were implemented. To the

---

[38] ACLU ANALYTICS, *Decarceration and Crime During COVID-19* (July 27, 2020) available at https://www.aclu.org/news/smart-justice/decarceration-and-crime-during-covid-19/

contrary, in nearly every city, *fewer* crimes were reported between March and May, 2020 compared to the same time period in 2019. The study concluded that, during the relevant time period, jail population and crime trends were "functionally unrelated.".

The totality of the circumstances demonstrate that reducing Mr. Jenkins' sentence to time served after serving about half of his time, the equivalent of a 50-month federal sentence, is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

Mr. Jenkins has a solid start on a release plan to ensure his safe transition to the community, and continues to be willing to participate in treatment (which has not recently been available to him while incarcerated due to COVID-19). In addition to assisting his elderly grandparents, Mr. Jenkins plans to find work and participate in treatment. This court has already set special conditions of probation to keep Mr. Jenkins on track. His existing conditions of supervision require:

> 1. The defendant shall participate in vocational, educational, and/or cognitive skills programs as directed by the probation officer, which programs may include job readiness training, skills development training, and cognitive skills development training. At the direction of the probation officer, the defendant may be required to pay for all or a portion of any such program.
> 2. The defendant shall submit to a warrantless search of person, residence, vehicle, personal effects, place of employment, and other property by a Federal probation or pretrial services officer or other law enforcement officer, based upon reasonable suspicion of contraband or a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation of supervision.
> 3. In addition to submitting to drug testing in accordance with the Violent Crime Control and Law Enforcement Act of 1994, at the direction of the probation officer the defendant shall obtain a substance abuse assessment

and participate in any recommended treatment. The treatment program must be approved by the United States Probation Office and the program must include testing to determine whether the defendant has reverted to the use of drugs or alcohol. At the direction of the probation officer, the defendant may be required to pay for all or a portion of any treatment program. In addition to urinalysis testing that may be a part of a formal drug treatment program, the defendant shall submit up to 12 urinalysis tests per month.

4. The defendant shall refrain from the use and/or possession of any synthetic cannabis substances unless prescribed by a physician and such prescription is approved by the Court, and shall not use and/or be in the possession of any designer drugs.

5. At the direction of the probation officer the defendant shall obtain a mental health assessment and participate in any recommended outpatient mental health treatment. The treatment program must be approved by the United States Probation Office. At the direction of the probation officer, the defendant may be required to pay for all or a portion of any treatment program. [Dkt. 84 at 5]

Considering these additional safeguards and his strong family support and guidance, this court can be assured that Mr. Jenkins will not be a danger to the community if released.

DATED at Anchorage, Alaska this 3rd day of April, 2021.

Respectfully submitted,

JANE MARTINEZ

CJA COUNSEL FOR DEFENDANT/PETITIONER

*/s/ Jane Martinez*

Certificate of Service:
I hereby certify that on the above date I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Jane Martinez*

24